UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARION HEINEMANN,

                              Plaintiff,

                                                    DECISION AND ORDER

                                                    02-CV-6211L

                    v.

HOWE & RUSLING,
THOMAS G. RUSLING,
ROBERT B. WOLF,
CRAIG D. CAIRNS,
BARBARA MACINNES,
JOHN K. BLEYAERT,

                              Defendants.

_____

        Plaintiff, Marion Heinemann, commenced this action against her former employer, Howe &

Rusling, Inc. ("H&R"), and several individual defendants, alleging claims under Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Equal Pay Act ("EPA"), 29

U.S.C. § 206(d), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New York Human

Rights Law ("HRL"), N.Y. Exec. L. § 296 *et seq.*[1]  Defendants have moved for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

_____

        [1]The complaint also asserts a claim under § 63 of the Rochester, New York Municipal
Code.  At oral argument on defendants' motion for summary judgment, plaintiff's counsel stated
that plaintiff was voluntarily withdrawing that claim, which is therefore dismissed.

## FACTUAL BACKGROUND

H&R is an investment management firm headquartered in Rochester, New York.  Plaintiff was hired by H&R in January 1999 as a portfolio manager.  At that time, she was one of four portfolio managers at H&R, and the only woman in that position.

At first, things went well for plaintiff, although she alleges that she did notice some indications of gender-based bias at H&R.  For example, Barbara MacInnes, the head of H&R's human resources department and a member of the Executive Committee, allegedly told plaintiff that she was surprised that H&R had hired a woman for plaintiff's position.

In addition, plaintiff alleges that the other, male portfolio managers were treated better than she was in certain respects.  She claims, for instance, that when she joined H&R, she was not initially allowed to vote on the investment committee, whereas male portfolio managers were allowed to do so as soon as they began their employment.  Plaintiff also alleges that she was generally introduced to clients as a "co-manager" on the clients' accounts, whereas her male colleagues were simply introduced as "managers" on the accounts.

Still, these alleged indications of bias were apparently not immediately of great concern to plaintiff, since she otherwise encountered few problems at work.  Within her first six months, she received a raise in her annual salary from $80,000 to $85,000, and she received a very positive performance review in July 1999.  In January 2000, she was given a $15,000 bonus and another raise in salary to $92,000.

One day, however–the exact date is not indicated in the record–Bob Wolf, a vice president and member of the H&R Executive Committee, allegedly came into plaintiff's office and told her that he had a new account for her, adding that the clients "didn't have a problem with a woman manager." Heinemann Depo. (Dkt. #133-2) at 102. When plaintiff asked Wolf what he meant by that, he allegedly responded, "Well, I always ask if the client has a problem with a woman manager. A lot of people don't want to work with a woman. I have to ask." *Id.* at 102-03. Plaintiff alleges that she replied, "If I were black, would you ask them if they had a problem dealing with a black?," but Wolf simply waved her off, and refused to discuss the matter any further. *Id.* at 103. A short time later, however, Wolf allegedly come back to plaintiff's office and told her, "Marion, you are right, I won't do it [*i.e.*, ask clients if they would have a problem working with a woman] anymore." *Id.* at 106.

Plaintiff alleges that she then went to talk about Wolf's comments with her supervisor, Jack Anderson. Anderson, however, confirmed that it was H&R's practice to ask clients if they had any problems dealing with a female manager, stating, "Well, of course we have to ask. We have an obligation to do what our clients want. And a lot of people don't want to deal with a woman. Of course we ask." *Id.* at 104.

Although it is not clear what prompted him to say this, Anderson also allegedly told plaintiff during this conversation that she "ha[d] to realize" that as a woman, plaintiff was "not ever going to be paid as much as a man is, and [that she] just ha[d] to be realistic." *Id.* at 105.

Plaintiff next went to MacInnes, and told her about both Wolf's and Anderson's comments. Plaintiff alleges that MacInnes said, "That's just wrong," and that she would "take this to [the] Executive Committee." *Id.* at 109.

Plaintiff testified at her deposition that some time after this conversation with MacInnes, she saw MacInnes again, and that MacInnes told her that she had taken plaintiff's complaint to the Executive Committee, and that the committee "said to tell you they were sorry if they hurt your feelings, and they wouldn't tell you anymore that people don't want to deal with a woman." *Id.* at 111. Plaintiff allegedly replied, "That's ridiculous. That doesn't address the issue," but MacInnes simply answered, "Well, that's what they said," and, "There's nothing else you can do." *Id.* at 113.

According to plaintiff, there were other indications that gender played a role in her work assignments. Plaintiff testified that on one occasion, Wolf asked her to participate in a conference call with a new client who was being assigned to plaintiff. The client was a woman. During the telephone conversation, the client began discussing her husband's account. Wolf allegedly asked the client, "Your husband is opening an account with us?" When the client responded that he was, Wolf allegedly began stuttering and became visibly nervous and uncomfortable. When the call was over, plaintiff allegedly asked Wolf, "You thought it was just a woman, didn't you?," and he answered, "Yes, I did." *Id.* at 130-31.

Plaintiff also testified that at one time, she was slated to conduct a seminar for a women's group. At some point in the planning process, it developed that the audience would consist of both men and women. She alleges that when Wolf found that out, he told her, "Since it's now men and women, you can't do it; I'll do it." *Id.* at 183. Wolf allegedly told plaintiff that instead of leading

- 4 -

the seminar, she could "pass out flyers in the back," *id.*, which she declined to do, and she took no part in the seminar.

Plaintiff also complained to management at H&R that the book of business she had been given was not as good as the other, male, managers'. Specifically, she complained that her "clients [we]re smaller," that she "ha[d] a higher percentage of new clients," and that she "ha[d] the majority of troublesome clients." *Id.* at 140. Defendants testified that they understood these complaints to be, at least in part, based on plaintiff's belief that she was being discriminated against because she was a woman. Wolf Depo. (Dkt. #133-5) at 165; Thomas G. Rusling Depo. (Dkt. #134-7) at 263-64.

Plaintiff contends that her July 2000 performance review–which followed some of her complaints discussed above–was more negative than her July 1999 review. Whereas her 1999 review had rated plaintiff's performance as "exceed[ing] job requirements" in two of the six categories in which she was rated, and as "meet[ing] job requirements" in the other four, her July 2000 review (which added four new categories) rated plaintiff as "need[ing] improvement" in three categories (job knowledge, adaptability and leadership), "exceed[ing] job requirements" in three categories, and "meet[ing] job requirements" in the remaining four categories. Dkt. #135-6 at 14-15; Dkt. #120 at 31-32.[2] The "summary" portion of the review described it as a "split review," stating

---

[2]Each category was also broken down into subcategories. The 1999 review had 26 subcategories, in which plaintiff was given one "outstanding," 15 "exceeds job requirements," and 10 "meets job requirements." The 2000 review had 51 subcategories, in which plaintiff was given seven "outstanding" grades, 14 "exceeds job requirements," 20 "meets job requirements," 9 "needs improvement" grades, and 1 "unsatisfactory."

Although this was not done on her performance reviews, if those five subcategory grades–outstanding, exceeds job requirements, meets job requirements, needs improvement, and unsatisfactory–were weighted according to a traditional "4.0" grade point average system, plaintiff's average would have dropped from 2.76 in July 1999 to 2.33 in 2000.

that although plaintiff had "added much value to the firm," H&R was "concerned about a high cancellation rate and anecdotal evidence of ineffective servicing."  Dkt. #120 at 32.

Plaintiff wrote a nine-page memorandum to the Executive Committee on July 17, 2000, taking issue with many aspects of the review.  Def. Ex. F.  In response, the committee issued an "addendum" to the review in January 2001, in which it "acknowledge[d] that there should have been more research done prior to giving Marion her review."  Def. Ex. Q.  The committee stated that with respect to plaintiff's cancellation rate, the committee had not sufficiently taken into account the fact that plaintiff's "account base is largely made up of new clients," and that "the service burden is larger with new clients because of recent performance."  The addendum also stated that "too few meetings were witnessed prior to making judgments about Marion's client service skills," and it described as "ill-advised" a statement in the review that the projects that plaintiff had worked on outside of her primary role as portfolio manager "did not matter."  The committee said that "[t]his statement should not have been made because all of the projects Marion has worked on have been important to Howe & Rusling."  *Id.*

The employment relationship between plaintiff and H&R continued to deteriorate, however. The minutes of a March 14, 2001 meeting of the Executive Committee (Def. Ex. W) reflect that "Craig [Cairns, a member of the committee] initiated a discussion concerning Marion[ Heinemann]'s poor attitude and her claim of 'having nothing to do.'"  Cairns stated that there were four "options to deal with the situation," including "requir[ing] more servicing of clients" by plaintiff, giving her more accounts to service, moving her to a different position, or terminating her.  *Id.*

The minutes further reflect that MacInnes "pointed out that Marion had good written reviews, good raises and good bonuses.  H&R d[id] not have grounds to fire Marion according to written documentation."  *Id.*  The Executive Committee members "agreed that Marion need[ed] to be dealt with directly and openly, that everything discussed above [had to] be relayed to her, and that specific goals need[ed] to be established and reviewed every two to three months."  Cairns "agreed to write up a review of what [wa]s expected of Marion and present that to her ... ."  *Id.*

On April 4, 2001, Cairns prepared a written "mid-year review" of plaintiff.  Def. Ex. Y.  This was apparently not customary for portfolio managers; the document states that "the reasons for the review are Marion's continued complaints about 'not having enough to do' and demands for 'a full time job' at Howe & Rusling.  This review is self-induced and focuses directly on Marion's demands."  *Id.*

The two-page review focused mainly on the areas of "servicing accounts" and "bring[ing] in new business."  The review did not say anything about plaintiff's client cancellation rate.  It concluded with four recommendations:  that plaintiff "[i]ncrease the level of client meetings and contacts"; that she "[w]ork on creative ways to obtain new business"; that she "increase her investment knowledge"; and that she "should continue to volunteer for important firm needs such as newsletter articles, mid-quarter letters, and a role in financial planning."  *Id.*

Things did not improve, however.  The day after Cairns gave plaintiff the review, she sent him an email message with a number of questions about some of the recommendations that he had made in the review, which plaintiff described as a "nasty missive."  Def. Ex. CC.  In another email dated April 12, 2001, plaintiff asked Cairns some additional questions, adding, "As the firm so

- 7 -

clearly believes that I am dismally failing to meet even minimal job requirements[,] delays in answering these questions act only to further that dismal failure." Def. Ex. EE. At an April 6, 2001 meeting, the Executive Committee was told by Cairns that plaintiff had "determined that 'we are out to get her,'" and decided that plaintiff's "work needs to be monitored to determine if further action is necessary." Def. Ex. DD.

In May 2001, plaintiff collapsed while at a client event. A colleague drove her home, and plaintiff apparently returned to work the following day. Plaintiff states that her collapse was related to the after-effects of a stroke that she had suffered in late August 2000. *See* Dkt. #133-3 at 209-14.[3]

Following plaintiff's collapse, H&R asked her to submit medical documentation that she was physically able to perform her duties. H&R subsequently changed its request, asking instead for a physician's statement that plaintiff was able safely to drive a car. Plaintiff did produce such a note from her doctor, dated June 21, 2001. Def. Ex. TT.

On August 1, 2001, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex and disability, and unlawful retaliation. Def. Ex. UU. On September 28, 2001, the parties attended a mediation session, which was unsuccessful, and plaintiff was terminated a few days later. An internal H&R memorandum (which is unsigned but was apparently prepared by Cairns, *see* Cairns Aff. (Dkt. #109) ¶ 122) dated October 8, 2001, listed a number of problems with plaintiff's performance, and concluded, "We see no choice but to terminate Marion at this time. The loss of revenue due to

---

[3]Although plaintiff states that she was told at the hospital in August 2000 that she "had a very, very large stroke," Dkt. #133-3 at 212, she states that after a three-day stay in the hospital, she was told by her physician that she could return to work with no limitations, and that she did return to work about a week after the stroke occurred. *Id.* at 212-13.

cancellations, virtually no business production and a poor attitude lead us to this decision." Def. Ex. EEE.

Plaintiff filed the complaint in this action in April 2002. She has named as defendants H&R, and the individual members of the Executive Committee: Thomas Rusling, Wolf, Cairns, MacInnes, and John Bleyaert. Plaintiff alleges that she was discriminated against on account of her sex, age and disability, in violation of Title VII, the ADEA, and the ADA respectively, and she has also asserted analogous claims under the HRL. Plaintiff also alleges that she was retaliated against for opposing such discrimination, in violation of those same statutes, and that she was not paid as much as male employees performing similar work, in violation of the EPA.

## DISCUSSION

### I. Summary Judgment Standards

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' ... An issue of fact is

'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2$^d$ Cir. 2001) (quoting *Liberty Lobby*, 477 U.S. at 248).

"If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment." *Duse v. International Business Machines Corp.*, 252 F.3d 151, 158 (2$^d$ Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In deciding a motion for summary judgment, then, "[t]he trial court's function ... is to identify issues to be tried, not decide them." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2$^d$ Cir. 2000); *accord Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F.Supp.2d 489, 494 (W.D.N.Y. 2007).

The Supreme Court has "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). Nevertheless, "special care should be taken when entertaining motions for summary judgment in discrimination cases where, as here, the employer's intent is at issue." *Dargento v. Bally's Holiday Fitness Centers*, 990 F.Supp. 186, 189 (W.D.N.Y. 1997). Indeed, the Second Circuit has "emphasized [that] careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination," and that as a result, "[s]ummary judgment is sparingly used where intent and state of mind are at issue ... ." *Graham*, 230 F.3d at 38 (citations omitted). In short, "the trial court's task at ... [this] stage of the litigation is carefully limited to discerning whether there are

any genuine issues of material fact to be tried, not to deciding them.  Its duty ... is confined at this

point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential*

*Services Ltd. Partnership*, 22 F.3d 1219, 1224 (2[d] Cir. 1994).


## II. Plaintiff's Discrimination and Retaliation Claims–Legal Framework

Plaintiff's claims of sex, age and disability discrimination are subject to the burden-shifting

analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, plaintiff must establish

a prima facie case of discrimination by demonstrating:  (1) membership in a protected class; (2)

satisfactory job performance; (3) an adverse employment action; and (4) circumstances giving rise

to an inference of discrimination.  *See Collins v. New York City Transit Authority*, 305 F.3d 113, 118

(2[d] Cir. 2002).[4]

Once plaintiff has established a prima facie case, the burden shifts to defendant to articulate

a legitimate, nondiscriminatory reason for the adverse employment action.  *See James v. New York*

*Racing Ass'n*, 233 F.3d 149, 154 (2[d] Cir. 2000).  The burden then returns to plaintiff to present

evidence that the proffered reason is a pretext for discrimination. *See St. Mary's Honor Center v.*

*Hicks*, 509 U.S. at 508 (1993).  Although "direct evidence of discrimination is not necessary,"

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2[d] Cir.), *cert. denied*, 530 U.S. 1261 (2000), "an

employer [is] entitled to judgment ... if the record *conclusively* reveals some other, nondiscriminatory

reason for the employer's decision, or if the plaintiff only creates a weak issue of fact as to whether

the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence

---

[4]In general, plaintiff's HRL claims are subject to the same analysis as her federal claims.
*Ghent v. Moore*, ___ F.Supp.2d ___, 2007 WL 3101050, at *4 (W.D.N.Y. Oct. 23, 2007).

that no discrimination had occurred." *Reeves*, 530 U.S. at 148 (emphasis added); *see also Norton v. Sam's Club*, 145 F.3d 114, 118-120 (2[d] Cir. 1998) (holding that an age discrimination case "may be built entirely out of circumstantial evidence"); *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2[d] Cir. 1991) (recognizing that employers are unlikely to leave "smoking gun" evidence "attesting to discriminatory intent").

The analysis is similar as to retaliation claims. Plaintiff must first make out a prima facie case of retaliation, by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) employer action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199, 207 (2[d] Cir. 2006) (citation omitted); and (4) a causal connection between the protected activity and the employer action. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2005). "Once a prima facie case is made out, the burden shifts to defendant to demonstrate a legitimate nondiscriminatory reason for its decision. If such a reason is articulated, plaintiff must then prove that the proffered reason was a pretext for retaliation and that defendant's real motivation was the impermissible retaliatory motive." *Donato v. Plainview-Old Bethpage Cent. School Dist.*, 96 F.3d 623, 634 (2[d] Cir. 1996), *cert. denied*, 519 U.S. 1150 (1997).

Evidence supporting the plaintiff's prima facie case, plus evidence that the defendants' proffered reasons for her termination are false, may, in some cases, be enough to withstand summary judgment. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2[d] Cir. 2001). Whether summary judgment is appropriate in a particular case depends upon "the strength of the plaintiff's prima facie case, the

probative value of the proof that the [defendants'] explanation is false, and any other evidence" that supports the defendants' case.  *Reeves*, 530 U.S. at 148-49.


## III. Application to this Case

Defendants contend that plaintiff has not established all of the elements of her prima facie case of discrimination.[5]   In particular, defendants deny that plaintiff's job performance was satisfactory.  Since defendants have proffered a legitimate, nondiscriminatory reason for their actions, however, "I will proceed to the ultimate issue of whether plaintiff[ ] ha[s] presented sufficient evidence of pretext to give rise to a genuine issue of material fact." *Kourofsky v. Genencor Intern., Inc.*, 459 F.Supp.2d 206, 211-12 (W.D.N.Y. 2006); *see United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant"); *Wado v. Xerox Corp.*, 991 F.Supp. 174, 187 (W.D.N.Y. 1998) (where defendant proffered legitimate, nondiscriminatory reasons for plaintiffs; terminations, court would "assume that [each plaintiff] ha[d] made out a prima facie case, and proceed to consider whether the plaintiff ha[d] presented sufficient evidence to create a triable issue of fact about whether Xerox's proffered reason [wa]s a pretext for discrimination"), *aff'd sub nom. Smith v. Xerox Corp.*, 196 F.3d 358 (2[d] Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2[d] Cir. 2006).

---

[5]Although defendants contend that plaintiff cannot make out a prima facie case of retaliation, they do not explain or discuss that contention, but focus solely on the issue of pretext. *See* Def. Mem. of Law (Dkt. #125) at 12-14.

On the record before me, I find that there are genuine issues of material fact as to plaintiff's claims of discrimination and retaliation under Title VII.  I also find, however, that plaintiff has not presented sufficient evidence to give rise to any factual issues on her claims under the ADEA and the ADA, and that defendants are entitled to summary judgment dismissing those claims.

There is evidence on both sides of the issue and the factfinder may well find against plaintiff who, of course, has the ultimate burden of persuasion.  At this stage, though, I cannot find as a matter of law that plaintiff may not prosecute her case under Title VII to the jury.


## A. Evidence of Pretext

At the time of plaintiff's termination, defendants cited three reasons for their decision:  client cancellations, lack of business production by plaintiff, and plaintiff's poor attitude.  Viewing the record in the light most favorable to plaintiff, the nonmoving party, I find that there are issues of fact concerning whether defendants' proffered reasons for terminating plaintiff are pretextual.

The first proffered reason–plaintiff's account cancellation rate–is perhaps the most important reason, why, according to defendants, plaintiff was terminated.  In Cairns's affidavit in support of defendants' summary judgment motion, for example, he lists thirteen problems with plaintiff's work performance, six of which relate to her client cancellations.  *See* Dkt. #109 ¶ 7.

Plaintiff contends, however, that her cancellation rate was largely a function of the types of accounts that were assigned to her, including many relatively new accounts and poorly-performing accounts.  According to plaintiff, newer clients, since they lack an extended relationship with H&R, have little loyalty to the firm.  They are therefore more likely than established clients to cancel their

accounts, particularly in a down market, and especially when the firm as a whole is underperforming

the market, as H&R was during the relevant time period.  Plaintiff also alleges that the portfolio

manager has little if any control over how well a client's account performs, since performance is

largely based on decisions by the firm's investment committee, of which plaintiff was not a member.

Plaintiff further alleges that a lot of the accounts that were assigned to her were poor, in the

sense that the return on the clients' investments was not good.  When plaintiff began working at

H&R, a number of accounts were "gifted" to her from the other managers, to give plaintiff a book

of business to start out with.  Perhaps not surprisingly, the other managers allegedly chose from

among their more poorly performing accounts to give to plaintiff.  Plaintiff does not appear to allege

that this was in itself discriminatory, but she does allege that this was another reason why some of

her clients cancelled their accounts.  A client whose investments are not doing well is more likely

to cancel than one whose investments are yielding a healthy rate of return.

In support of these contentions, plaintiff has submitted a report by her expert, Elizabeth

Becker, Ph.D., who holds a doctorate in applied economics and who is a managing director of Huron

Consulting Group, Inc., a firm that provides litigation-related economic, statistical and accounting

services.  Dr. Becker states that after examining data pertaining to plaintiff's and other H&R

managers' accounts, she concludes that the accounts that were assigned to plaintiff, by their very

nature, were more likely to be cancelled by the clients than were the accounts of other (male)

portfolio managers at H&R.  Dkt. #135-7 at 3-4.  Becker also states that after taking into account the

effects of certain objective attributes of plaintiff's accounts (such as the age of the accounts),

plaintiff's "likelihood of account cancellation was not significantly worse than [that of] the male

Portfolio Managers" during the period from the time that plaintiff was first warned that her account cancellation rate was unacceptably high up to the time of her termination.  *Id.* at 4.

Becker also opines that "[d]ata indicating that her rates were considerably worse than her peers in this period were not accurate," *id.*  She contends that H&R's computation of cancellation rates "is methodologically flawed" in certain respects, and that even following the methodology that H&R claims to have used in calculating plaintiff's cancellation rate, it is impossible to come up with the same figures as H&R.  *Id.* at 10.

Although defendants take issue with Dr. Becker's conclusions, it is not the Court's function at this stage to determine whether they are correct.  *Gallo*, 22 F.3d 1219, 1224.  In addition, there is evidence that defendants themselves believed that plaintiff was somewhat hamstrung by the types of accounts that had been assigned to her; as noted, the Executive Committee's January 2001 "addendum" to plaintiff's performance review acknowledged that with respect to plaintiff's cancellation rate, the committee had not sufficiently taken into account the fact that plaintiff's "account base is largely made up of new clients," and that "the service burden is larger with new clients because of recent performance."  Def. Ex. Q.  I also note that the April 4, 2001 "mid-year review," which was purportedly prompted in part by problems with plaintiff's performance, and which preceded her termination by about six months, did not even mention plaintiff's client cancellation rate.  I conclude, therefore, that there are issues of fact concerning whether defendants' citation of plaintiff's account cancellation rate as a reason for her discharge is pretextual.

There are also issues of fact with respect to defendants' other proffered reasons for terminating plaintiff, *i.e.*, her failure to develop new business and her poor attitude.  Plaintiff

contends that developing new business was never stressed as a major job function of portfolio managers, and that primary responsibility in that area lay with Cairns.  Plaintiff's written job description does indicate that portfolio managers had some responsibility for business development, but the job description seems to focus primarily on client servicing, with relatively less emphasis on business development.  Dkt. #135-8 at 5-6.

With respect to plaintiff's "negative" attitude, it is undisputed that, particularly toward the latter part of her tenure at H&R, plaintiff's working relationship with defendants–Cairns in particular–was less than harmonious.  It appears, however, that much of the friction stemmed from matters that are at the heart of this lawsuit, including plaintiff's account assignments and her assertions that she was being treated unfairly in comparison with the male portfolio managers.. Although there may certainly be instances in which an employee's negative attitude will justify her termination, it would also be all too easy for an employer engaging in unlawful employment practices to invoke the employee's "negative attitude" (which was prompted by the unlawful practices themselves) as a reason for terminating the employee.

I also note that defendants do not appear to dispute that, with respect to plaintiff's April 2001 "mid-year review," which at least in part was decidedly negative, it was not customary for portfolio managers to be given *any* midyear reviews.  Plaintiff contends that this review was the result of defendants' desire to begin laying the foundation for her eventual termination, given their recognition that H&R did not yet have adequate grounds to fire her at that time.

"[A]n employer's deviation from its own standard procedures may serve as evidence of pretext."  *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006).

- 17 -

*See, e.g.*, *Colgan v. Fisher Scientific Co.*, 935 F.2d 1407, 1423 (3[d] Cir.) (fact that plaintiff employee did not receive customary 60- to 90-day reevaluation prior to termination for poor performance "could permit the trier of the fact to infer that management willfully orchestrated the sequence of events"), *cert. denied*, 502 U.S. 941 (1991).  Although it may well be that this review was simply a legitimate attempt to respond to plaintiff's complaints about not being given enough work to do, and to try to help her improve and to reach some understanding between her and H&R management, "it is [the Court's] obligation at this stage to interpret ambiguities in the evidence in the light most favorable to the plaintiff."  *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 116 (2[d] Cir. 2007).

Certainly there is evidence in the record from which a trier of fact could conclude that defendants were more than justified in terminating plaintiff.  There is evidence that plaintiff did have difficulties dealing with her supervisors, coworkers, and clients, and that those difficulties were caused at least in part by her own actions and behavior.  Again, though, whether that was the reason for plaintiff's termination presents issues of fact.  It is not for the Court to resolve those factual issues and decide whether plaintiff's termination was lawfully motivated, but only to determine whether there are issues to be determined by a jury.  *Gallo*, 22 F.3d at 1224.

**B. Title VII Discrimination Claim**

Evidence of pretext alone, of course, is generally not enough to defeat a well-founded motion for summary judgment.  Plaintiff must also present evidence that defendants' proffered reasons for

terminating her are pretexts for unlawful *discrimination*.  I find, however, that such evidence exists with respect to plaintiff's Title VII claim.

First, there is an issue of fact as to Wolf's alleged admission to plaintiff that he always asked prospective clients whether they would "ha[ve] a problem with a woman [portfolio] manager," because "[a] lot of people don't want to work with a woman," and that he therefore "ha[d] to ask." While defendants deny that Wolf ever made any such statement, plaintiff testified to the contrary. She also alleges that her supervisor, Jack Anderson, confirmed this policy, saying, "Of course we ask."  *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) (while police chief denied making statement that plaintiff would not receive a promotion to sergeant "now or ever," "this factual dispute is an issue of credibility for the jury").

In addition, Wolf testified at his own deposition that it "could be" that he made such statements to plaintiff.  Wolf Depo. (Dkt. #133-4) at 58.  He also stated that his "mother ... couldn't imagine that a woman could possibly manage her account, she wanted a man," adding that, in contrast, his "daughter, who is in the financial business, wouldn't want a man managing her account, she'd want a woman managing the account."  Dkt. #133-4 at 57.[6]

If Wolf did in fact regularly ask clients if they would have a "problem" working with a female portfolio manager, that is some evidence of animus toward women.  *See Rivers-Frison v. Southeast Missouri Community Treatment Center*, 133 F.3d 616, 621 (8th Cir. 1998) (fact that defendant "assigned Rivers-Frison only African-American clients until she complained" was

_____

[6]In H&R's Statement of Position to the EEOC, H&R stated that "one Marketing Manager at Howe & Rusling [*i.e.*, Wolf] *perhaps* asked potential clients if they would work with a female Portfolio Manager ... ."  Dkt. #135-8 at 53 (emphasis added).

evidence of racial animus); *see also Holcomb v. Powell*, 433 F.3d 889, 899 (D.C. Cir. 2006) ("A plaintiff in a Title VII case ... can ... avoid summary judgment by presenting other evidence, direct or circumstantial, that permits an inference of discrimination. ... Examples of such evidence include discriminatory statements by the employer, ... or other attitudes suggesting the decision maker harbors discriminatory animus").

Wolf's alleged statement may not show that *he* believed that women were less capable than men at managing clients' accounts, but it does indicate that Wolf may have both presupposed possible prejudice on the part of H&R's clients, and that he was amenable to such prejudice if it did exist. This evidence suggests that Wolf took pains to let each client know in advance that if the client did have a "problem" with the idea of a woman handling the client's account, H&R was more than willing to accommodate the client by reassigning the account to a man. In addition, simply by asking a client whether the client would have a problem working with a female portfolio manager–which could only mean plaintiff–Wolf could have subtly suggested to the client that there might have been some reason why the client *should* prefer that a different, male manager handle the account, *e.g.*, that plaintiff may not have been as able or competent as her male colleagues.

In addition, defendants themselves apparently recognized that it would have been improper to ask clients such a question. MacInnes testified that when plaintiff complained to her about Wolf's alleged statement, MacInnes "expressed shock" that Wolf would say such a thing. Dkt. #134-5 at 160. MacInnes testified that when she told Wolf about plaintiff's complaint, Wolf insisted that he "would never say such a negative thing to a client," and that the Executive Committee instructed MacInnes to tell plaintiff that they were "very sorry that this incident happened ... ." *Id.* at 161-62.

MacInnes also opined at her deposition that "[i]t would not have been appropriate at any time" to ask clients if they had a gender preference with respect to their portfolio managers. *Id.* at 172.[7] Although arguably this might suggest that Wolf would have refrained from making such statements in the first place, a finder of fact might also infer from this that Wolf asked clients this question knowing full well that it was improper if not unlawful for him to do so.

This evidence is also given added significance by Wolf's senior position within H&R and his role in plaintiff's termination:  Wolf was a vice president and member of the five-person Executive Committee, which voted unanimously to terminate plaintiff.   Moreover, his alleged statements related to the assignment of particular accounts to plaintiff, a central issue in this case: one of the reasons given by the Executive Committee for terminating plaintiff was that she had a high client cancellation rate, which plaintiff contends was in large part a function of the types of accounts assigned to her.  *See Tomassi*, 478 F.3d at 115 (stating that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be," whereas "[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"); *see also Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d

---

[7]I also note that according to MacInnes, after the Executive Committee instructed her to tell plaintiff that H&R was "very sorry that this incident happened," they also suggested that in the future, "[p]erhaps we will just hand [clients] our biographies that we have on each of our portfolio managers and say, 'Who would you like from this group, who would you prefer working with ... .'" Dkt. #134-5 at 13.  While such a practice would certainly not be wrongful, it also would not be inconsistent with a continued desire to make clients aware (by showing them the portfolio managers' names) that one of H&R's portfolio managers was a female.

Cir. 2001) (contrasting "the stray remarks of a colleague" with "comments made directly to" the plaintiff by someone with "enormous influence in the decision-making process").

There is also some evidence that in general, H&R viewed plaintiff as best suited for handling "female" accounts, *i.e.*, the accounts of women clients, women's groups, and the like.[8]  As noted, plaintiff alleges that on one occasion, Wolf became visibly disconcerted when he found out that an account that was being assigned to plaintiff was not that of a single female client, as he had believed, but that of a married couple.  Plaintiff's testimony about not being allowed to conduct a seminar when it turned out that there would be both men and women in the audience (and being told that she could "pass out flyers in the back" instead) also supports such an inference.  That evidence, like Wolf's alleged statements about asking clients if they minded working with a woman, tends to show animus toward women on the part of defendants.  *See E.E.O.C. v. Tarrant Distributors, Inc.*, 750 F.2d 1249, 1251 n. 2 (5th Cir. 1984) ("The assignment of black salesmen to sales territories composed primarily of black accounts could constitute an unlawful employment practice").

I note that in support of their motion, defendants also rely on the "same actor" inference–*i.e.*, "that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee."  *Carlton*, 202 F.3d at 132.  Defendants state that some of the same individuals who voted to terminate plaintiff were also instrumental in her hiring, and that it is therefore unlikely that those individuals would have harbored any bias against women.

---

[8]Although defendants point to evidence that during the early part of plaintiff's tenure at H&R, the vast majority of all new accounts were assigned to her, regardless of the clients' gender, that may simply be a reflection of the fact that very few clients did indicate that they had a "problem" working with a woman manager.

Just as people's attitudes can change over time, however, the forcefulness of the same-actor inference diminishes over time.   Although plaintiff was not at H&R for a particularly long time–about two years and nine months–the inference in this case is not as strong as it would be if she had been fired within a few weeks or months after her hiring.  *See Nanton v. City Of New York*, No. 05 CIV. 8989, 2007 WL 2319131, at *5 (S.D.N.Y. Aug. 10, 2007) ("Since roughly two-and-a-half years passed between Nanton's promotion to the General Counsel position and the termination of her employment, the 'same actor' inference is insufficient to win summary judgment in the context of the evidence submitted with this motion") (Title VII case).

There is also authority that "an employer might hire an employee of a certain gender expecting that person to act, or dress, or talk in a way the employer deems acceptable for that gender and then fire that employee if she fails to comply with the employer's gender stereotypes." *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 745 (7th Cir. 1999).  Arguably, defendants hired plaintiff expecting her to submit to discriminatory treatment (or as Anderson allegedly put it, expecting her to "be realistic" about such matters), and when she proved to be less compliant in that regard than they had they anticipated, they fired her.  In any event, even if a jury might permissibly draw a same-actor inference in this case, such an inference is not so compelling as to entitle defendants to summary judgment, in the face of plaintiff's evidence of pretext.


## C. Title VII Retaliation Claim

Plaintiff has also presented enough evidence to overcome defendants' motion for summary judgment on her Title VII retaliation claim.  For one thing, she has presented evidence that after she

complained about what she perceived to be discriminatory treatment on account of her sex, her performance reviews became more negative.  In addition, plaintiff was terminated about two months after she filed her EEOC complaint.

Although temporal proximity between protected activity and an adverse employment action, standing alone, will not necessarily give rise to a genuine issue of material fact, such evidence does lend some support to plaintiff's retaliation claim.  *See, e.g.*, *Gallagher v. Delaney*, 139 F.3d 338, 349-50 (2ᵈ Cir. 1998) (evidence that plaintiff "received good performance reviews until shortly after she protested [supervisor's] sexually objectionable words and deeds," and that she was "allowed fairly liberal vacation-personal-sick leaves before complaining about her treatment ..., yet 'penalized' after her complaints were made," supported retaliation claim and precluded summary judgment for employer); *Dominic v. Consolidated Edison Co. of New York, Inc.*, 822 F.2d 1249, 1255 (2ᵈ Cir. 1987) (decision by plaintiff's supervisor to re-rate, downward, plaintiff's performance shortly after plaintiff filed administrative complaint against employer, supported jury's conclusion that plaintiff's discharge was for purposes of retaliation; "Although this was a very close case that [the court of appeals] might well have decided differently [had it been] the trier of fact[, ... i]t [wa]s not [the court's] province to resolve these conflicting factual claims"); *Wilks v. Elizabeth Arden, Inc.*, 507 F.Supp.2d 179, 196 (D.Conn. 2007) (necessary temporal proximity had been shown between plaintiff's administrative complaint and adverse employment actions, where the adverse actions occurred about six months after the protected activity).

I also note that, when plaintiff challenged her July 2000 review–which was more negative than her prior reviews–defendants eventually conceded that it was inaccurate in some respects.

Although H&R thus did respond to plaintiff's complaints about the review, this might also suggest that the review as originally written was a less than completely honest assessment of plaintiff's performance.

The evidence also suggests that one of the sources of rancor between plaintiff and defendants was plaintiff's complaints about job assignments and other matters. *See*, *e.g.*, Def. Ex. Y (plaintiff's mid-year review stating that her "attitude at times has gotten noticeably poorer because of her feelings that the odds are stacked against her at the firm").  Although defendants have generally characterized these complaints simply as examples of plaintiff's "poor attitude," there is also evidence–including the testimony of some of the defendants–that they understood at least some of plaintiff's complaints to implicate what plaintiff perceived to be possible sex discrimination.  *See* Wolf Depo. (Dkt. #133-5) at 165; Rusling Depo. (Dkt. #134-7) at 263-64.[9]

In addition, the minutes of the March 14, 2001 Executive Committee meeting reflect that when Cairns raised the possibility of terminating plaintiff (in part due to her "poor attitude"), MacInnes pointed out that plaintiff had gotten "good written reviews, good raises and good bonuses," and that H&R "d[id] not have grounds to fire [her] according to written documentation."

---

[9]When asked at his deposition whether he recalled whether plaintiff had complained in her EEOC charge that "her book of business was less favorable than the male portfolio managers'," Wolf replied that although he could not recall that, "It would not have been out of character to have her say that," because he "th[ought] she complained–talked about that before." Dkt. #133-5 at 165.

When asked at his deposition whether he remembered plaintiff "saying that she was assigned newer clients because she was a woman," Rusling testified that he "remember[ed] hearing that through Craig [Cairns], yes."  Dkt. #134-7 at 262-63.  Although Rusling later testified that he did not recall plaintiff ever linking her account assignments with her gender, *id.* at 265, at most that simply creates an issue of fact as to whether he was aware that plaintiff had complained of sex discrimination.

(Def. Ex. W).   There is some evidence that defendants then began laying down a paper trail (such as the "self-induced" "mid-year review" on April 4, 2001) leading up to plaintiff's termination in early October.   Again, while this evidence does not *compel* the conclusion that plaintiff's termination was retaliatory, it is at least consistent with an inference that defendants had tired of plaintiff's complaints, and decided to build a case against her to justify her termination.

Defendants also argue that plaintiff's retaliation claim fails because this evidence shows that defendants began considering plaintiff's termination months before she filed her EEOC charge.   As the Second Circuit has observed, however,

> [a]n employer or supervisor already dissatisfied with an employee's work performance may well react very negatively to a claim of discrimination and become even more inclined to discharge the employee.   Moreover, claims of discrimination usually follow adverse actions by an employer, who will justify them as based on poor performance by the employee. Evidence of prior dissatisfaction is thus present in virtually every case in which a claim of retaliation is made.   [Title VII's] prohibition of retaliation would thus be meaningless if such evidence precluded a jury from finding retaliation.

*Dominic*, 822 F.2d at 1255.   This fact, then, does not entitle defendants to summary judgment.

### D. Age and Disability Discrimination Claims

In contrast to plaintiff's Title VII claims, I find that there are no genuine issues of material fact with respect to plaintiff's claims under the ADEA and the ADA, and that defendants are entitled to summary judgment on those claims.   Even assuming that plaintiff has made out a prima facie case on those claims, there is no evidence that her age, or her actual or perceived disability, played any

- 26 -

role in H&R's decision to terminate her.[10]  There is also no evidence that she complained about being

discriminated against on account of her age or disability.[11]

Virtually the only evidence concerning age discrimination is plaintiff's contention that she

was replaced by a younger employee.[12]  That is not enough to defeat an otherwise well-founded

motion for summary judgment, however.  See *Kralman v. Illinois Dep't of Veterans Affairs*, 23 F.3d

150, 156 n. 7 (7th Cir.) ("replacement by someone younger, without more, will not give rise to an

inference of age discrimination"), *cert. denied*, 513 U.S. 948 (1994); *Mathews v. Huntington*, 499

F.Supp.2d 258, 268 n. 8 (E.D.N.Y. 2007) ("an employer's knowledge of a significant age

discrepancy between the discharged employee and his replacement ... does not, by itself, create an

issue of fact as to defendants' alleged discriminatory intent") (citations omitted).

There is also insufficient evidence to give rise to a factual issue on plaintiff's ADA claim.

Plaintiff contends that it was improper for H&R to demand that she produce medical documentation

that she was fit to perform her duties or that she was able to drive a car.  She contends that requiring

her to submit proof that she was fit to perform her duties (a request which H&R subsequently

---

[10]At oral argument on defendants' motion, counsel for plaintiff conceded that these claims are being pursued with "less vigor" than plaintiff's other claims, presumably in recognition of the relative weakness of these claims.

[11]Plaintiff's EEOC charge did allege age and disability discrimination, but aside from that there is no evidence that she ever complained to defendants about such matters.  Standing alone, the mere fact that she raised such claims in her administrative complaint is insufficient to give rise to any issues of material fact concerning her retaliation claims under the ADEA or ADA. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2[d] Cir. 2001); *Brown v. The Pension Boards*, 488 F.Supp.2d 395, 410 (S.D.N.Y. 2007).

[12]Defendants deny that plaintiff was replaced at all.  Any dispute concerning that matter is not material, however, since even if plaintiff was replaced by a younger employee, that alone is not enough to withstand defendants' motion for summary judgment.

modified to a request that she submit a physician's statement that she was able safely to drive a car) amounts to an impermissible "100% healed policy," *see McGregor v. National R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (holding that policies requiring employees to be "100% healed" before returning to work violate the ADA because they preclude individualized assessment of whether employee can perform the essential functions of the job with or without accommodation); *accord Warmsley v. New York City Transit Auth.*, 308 F.Supp.2d 114, 120 (E.D.N.Y. 2004).

Plaintiff also contends that requiring her to provide documentation that she was able to drive a car violated the ADA's provision that "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). She asserts that her job did not require her to drive, and that this inquiry was therefore impermissible. *See Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2[d] Cir. 2003) (discussing "business necessity" test).

I find it unnecessary to determine whether H&R's requests in this regard were permissible under the ADA, however, because there is no evidence that any disability on plaintiff's part, either actual or perceived by H&R, played any part in any adverse employment action taken against plaintiff. Aside from those requests themselves, there is simply no evidence that H&R took, or even threatened to take, any action against plaintiff on account of any disability on her part. *See Burchett v. Target Corp.*, 340 F.3d 510, 519 (8th Cir. 2003) ("Even if Target's refusal to transfer Burchett to a lower ranking job were viewed as an actionable adverse employment action, she has failed to

establish a causal connection between that refusal and her disability as required in the prima facie case").  This claim must therefore be dismissed as well.


**E. Equal Pay Act Claim**

Plaintiff's fifth cause of action is brought under the Equal Pay Act, which prohibits discrimination "between employees on the basis of sex by paying wages to employees ... at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

To prove discrimination under the EPA, a plaintiff must show that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions."  *Belfi v. Prendergast*, 191 F.3d 129, 135 (2$^d$ Cir. 1999) (internal quotation marks omitted); *see also* 29 U.S.C. § 206(d)(1).  "With regard to the second point, '[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are "substantially equal"'" in skill, effort, and responsibility.  *Lavin-McEleney v. Marist College*, 239 F.3d 476, 480 (2$^d$ Cir. 2001) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2$^d$ Cir. 1995)).  "Once it is clear that a plaintiff has proven that her job was more than merely comparable, the question of whether her job duties were substantially equal to the men she identifies is a question of fact, not law."  *Leibowitz v. Cornell Univ.*, No. 03 CV 9976, 2007 WL 3019223, at *10 (S.D.N.Y. Oct. 12, 2007) (citing *Tomka*, 66 F.3d at 1312).

"Under the EPA, as compared with Title VII, a plaintiff need not establish that the employer acted with 'discriminatory intent'; rather, the EPA 'creates a type of strict liability.'"  *Osborn v. Home Depot U.S.A., Inc.*, ___ F.Supp.2d ___, 2007 WL 2782526, at *4 (D.Conn. 2007) (quoting *Ryduchowski v. Port Auth. of New York & New Jersey*, 203 F.3d 135, 142 (2<sup>d</sup> Cir. 2000)).  "Thus, a *prima facie* showing gives rise to a presumption of discrimination."  *Belfi*, 191 F.3d at 136.  To make out her prima facie case, plaintiff must show that H&R paid at least one male employee higher wages than it paid plaintiff, for equal work on jobs requiring equal skill, effort, and responsibility, performed under similar working conditions.  *Belfi*, 191 F.3d at 135.

Once the plaintiff has made out her prima facie case, the burden of persuasion shifts to the defendant to prove that the pay disparity is justified by one of four affirmative defenses:  a "seniority system"; a "merit system"; an earnings system based on "quantity or quality of production"; or some other, non-gender-based factor implemented for "a legitimate business reason."  *Id.* at 136; 29 U.S.C. § 206(d)(1).  "The four statutory defenses are to be narrowly construed, however, and thus an employer faces a heavy burden in rebutting the plaintiff's prima facie showing."  *Osborn*, ___ F.Supp.2d at ___, 2007 WL 2782526, at *4 (citing *Ryduchowski*, 203 F.3d at 143).

"Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, 'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'"  *Ryduchowski*, 203 F.3d at 142 (quoting *Belfi*, 191 F.3d at 136).  The ultimate question is whether the justifications advanced by the defendant were simply pretextual or whether

they were "'used ... reasonably in light of the employer's stated purpose as well as other practices.'"
*Belfi*, 191 F.3d at 136 (quoting *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986)).

I find that genuine issues of material fact preclude summary judgment for defendants on plaintiff's EPA claim. Defendants appear to concede that plaintiff has made out her prima facie case, at least with respect to one male employee, Sam King, *see* Def. Mem. of Law (Dkt. #125) at 14. King's annual salary was several thousand dollars higher than plaintiff's, but defendants contend that this was attributable to the fact that he had been with H&R for about fifteen years, with a solid performance history throughout that period, at the time of plaintiff's hire.[13]

Coupled with Anderson's alleged statements to plaintiff that she had to realize that as a woman, she was "not ever going to be paid as much as a man is, and you just have to be realistic" in that regard, these facts alone might warrant denial of defendants' summary judgment motion. Plaintiff's EPA claim, however, also rests on alleged pay disparity between her and another male employee, Robert Prorok, who was hired as a portfolio manager in March 2000, a little over a year after plaintiff was hired.

There is some dispute concerning the relative pay of plaintiff and Prorok. Plaintiff contends that Prorok made more than she did in his first year of employment, and that the gap widened from there. Defendants contend that plaintiff "was usually paid more, but never less than Prorok." Dkt. #124 ¶ 33.[14]

---

[13]Plaintiff had about ten years of experience in investment management at the time of her hire by H&R. *See* Def. Ex. G.

[14]Defendants do not appear to dispute that plaintiff's and Prorok's job duties were similar.

There is some evidence to support plaintiff's allegations in this regard.  The record indicates that plaintiff began her employment in January 1999 with an annual salary of $80,000, which was increased to $85,000 in July 1999.  She received additional increases on January 1, 2000 to $92,000, and on July 1, 2000 to $100,000.  Def. Ex. FFF.

Prorok began working for H&R in March 2000, with an annual salary of $90,000, plus a "sign-on bonus" of $10,000.  Def. Ex. HHH.  Thus, if Prorok's sign-on bonus is included, his 2000 salary exceeded plaintiff's, whose 2000 salary averaged $96,000.[15]  Prorok's salary was increased to $100,000 on March 26, 2001.  Def. Ex. III.[16]

Defendants contend that because "it took Prorok one year to catch up with Plaintiff, notwithstanding his superior experience and job performance," Def. Mem. of Law (Dkt. #125) at 15, this evidence actually undercuts plaintiff's EPA claim.  While a jury may find such an argument persuasive, I find that plaintiff has made out a prima facie claim of pay disparity with respect to both King and Prorok, and that factual issues exist as to this claim.  Plaintiff alleges that her immediate supervisor explicitly told her that she would never "be paid as much as a man is," and, as stated, the defenses to an EPA claim are to be narrowly construed.  Defendants are therefore not entitled to summary judgment on this claim.  *See Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1312

---

[15]Plaintiff and Prorok also received performance bonuses of $13,966 and $10,714 for 2000, respectively.  Cairns Aff. (Dkt. #131) ¶ 131.  It appears that those amounts were not actually paid until 2001, but even if those figures are included in their total compensation for 2000, Prorok made $748 more than plaintiff that year.

[16]Plaintiff also alleges that Prorok's average salary for 2001 was $113,372.68.  Plaintiff has submitted H&R's 2001 W-2 Report indicating that Prorok's gross wages for 2001 totaled $124,086.68.  Dkt. #135-6 at 27.  Apparently that figure includes the $10,714 performance bonus for 2000, which was paid in 2001.

(10th Cir. 2006) (genuine issue of material fact existed regarding whether male coworker's prior work experience and salary history were the reason why he was paid more than female employee who occupied same job, precluding summary judgment for employer on Equal Pay Act claim); *Belfi*, 191 F.3d at 137-38 (genuine issues of material fact existed as to whether employer's gender-neutral explanations for female employee's unequal pay, *i.e.*, seniority and its gender-neutral application of its salary plan, were pretextual, precluding summary judgment as to Equal Pay Act claim).

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #108) is granted in part and denied in part. Defendants' motion is granted as to Counts III, IV and VI of the Second Amended Complaint (Dkt. #24).  In all other respects, defendants' motion is denied.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        January 2, 2008.